# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

AUDWIN WALKER,                      )
                                    )
      Plaintiff,                    )
                                    )
v.                                  )        Case No.:  2:16-cv-01669-JHE
                                    )
MILES COLLEGE, et al.,              )
                                    )
      Defendants.                   )

## MEMORANDUM OPINION[1]

Plaintiff Audwin Walker ("Walker") brings this action asserting claims under 42 U.S.C. § 1983 as well as various state law claims against Defendants Miles College and Percy Nolan ("Nolan").  (Doc. 1-1 at 3-8).  Defendants have moved for summary judgment on all of Walker's claims.  (Doc. 16).  The motion is fully briefed and ripe for review.[2]  (Docs. 16, 23 & 26).  For the reasons stated below, the motion is **GRANTED**.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 9).

[2] Walker initially failed to respond to the motion for summary judgment, and the undersigned ordered him to file a status report explaining why he had not done so.  (Doc. 21). Walker's status report indicates that his counsel failed to respond because there was a death in his immediate family, his parents are elderly, and he has had to travel to comply with directives of U.S. Customs and Immigration Services regarding his wife (who is a foreign national).  (Doc. 22). Although not docketed as a motion, Defendants responded to the status report with a request the motion for summary judgment be considered unopposed due to Walker's failure to meet the response deadline.  (Doc. 25).  In support, Defendants cited Walker's counsel's apparent failures to comply with the scheduling order.  (*See id.* at ¶¶ 8-14).  None of these failures have previously been brought to the court's attention, even though they apparently stretch back to mid-2017.  In any event, the undersigned declines Defendants' requests to consider the motion for summary judgment unopposed and/or dismiss the action for Walker's failure to comply with discovery responsibilities, and to the extent the response requests relief it is **DENIED**.  The undersigned will consider Walker's response in opposition to the motion for summary judgment.

# I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere

'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts[3]

### A. Miles College and Percy Nolan

Miles College is a private, historically black liberal arts college located in the city of Fairfield, Alabama. (Doc. 16-3 at ¶ 4). Along with state colleges and a number of other specifically-named private colleges, Miles College is authorized by Alabama law to maintain its

---

[3] Walker's response offers a statement of facts, but none of the facts he offers is accompanied by a citation to the record; instead, it appears to be, in large part, a repetition of the allegations in the complaint. Outside the facts section, Walker's response does cite to specific page and line numbers of Percy Nolan's affidavit, (*see* doc. 23 at 8), and it cites generally to Miles College Chief of Police Larry Kennon's affidavit, (doc. 23 at 9). To the extent these citations dispute a fact raised by Defendants, that dispute is noted below. The remainder of Walker's purported facts are inconsistent with his obligation under Rule 56:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted). However, the undersigned must still consider the merits of Defendants' motion, notwithstanding Walker's inadequate response. *See United States v. One Piece of Property, 5800 S.W. 4th Ave., Miami, Florida,* 363 F.3d 1099 (11th Cir.2004). Therefore, the undersigned has "review[ed] the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact." *Reese v. Herbert*, 527 F.3d 1253, 1269 (11th Cir. 2008). Accordingly, where the record reveals a factual dispute, the facts supporting that dispute are noted.

own police department.  (*Id.* at ¶¶ 5-6); ALA. CODE § 16-22-1.  Under this statutory authorization, a Miles College Police Department ("MCPD") officer possesses all the powers of any other police officer, including police arrest power, and must be certified through the Alabama Peace Officers' Standards and Training Commission ("APOSTC").  (Doc. 16-3 at ¶ 5-6).  The MCPD employs only two police officers: Miles College Chief of Police Larry Kennon and another officer.  (*Id.* at ¶ 6).  Chief Kennon is also a reserve officer with the Fairfield Police Department.  (*Id.* at ¶ 3).

The MCPD also employs eighteen security guards, who do not have police arrest power and are not APOSTC certified.  (*Id.* at ¶¶ 7-8).  These security guards patrol campus, ensure buildings are secure, and respond to calls for assistance on campus.  (*Id.* at ¶ 7).  A Miles College security guard's powers are limited: he or she may make a citizen's arrest, detain and/or search a person, and use force against a person, but only to the same extent as a private person on private property.  (*Id.* at ¶¶ 8-9).  In the case of an emergency, disturbance, or the commission of a crime, Miles College security guards depend on the assistance of MCPD officers or the Fairfield Police Department, just as a private person would.  (*Id.* at ¶ 9).  A Miles College security officer may request the help of police and, if needed, swear out a warrant against a person engaging in criminal conduct on campus.  (*Id.*).

Percy Nolan has been employed by Miles College since 2011 as a security officer.  (Doc. 16-5 at ¶ 2).  Prior to that, Nolan worked in a variety of security-related jobs: security guard at private businesses, corrections officer, school resource officer, and courtroom bailiff.  (*Id.*).  Nolan is not a police officer, is not APOSTC certified, and exercises no police powers in his capacity as a Miles College security guard.  (*Id.* at ¶ 4).  Nolan has, however, received training and certification in the use of firearms, and he has also been trained in defense tactics and the use of handcuffs.  (*Id.* at ¶ 3).

4

**B. Audwin Walker**

Audwin Walker is a Miles College alumnus. (Doc. 16-4 at 3-4 (8:15-9:1)). Walker had been the head drum major at Selma High School, and he received a marching band scholarship when he started at Miles College in 1999. (*Id.* at 4 (10:20-22, 12:8-13)). Academic and family issues hindered Walker's progress at Miles College, but Walker ultimately graduated in 2008. (*Id.* at 4-5 (10:20-16:14)). Although he is not a current student, Walker continues to be well known on campus, and it is not unusual to see him on campus for football games and other events. (Doc. 16-3 at ¶¶ 11-12; doc. 16-5 at ¶ 5). Walker described himself as "kind of famous up there . . . [i]t's like I'm a very popular guy." (Doc. 16-4 at 12 (43:18-20)). Walker goes by a variety of nicknames including Donatello, Ray Mon, Tello, and Chello. (Doc. 16-3 at 12, 14, 17; doc. 16-5 at ¶ 8).

Walker is currently a manager in training at Family Dollar. (Doc. 16-4 at 7 (23:3-11)). However, Walker also works part-time as a club promoter. (*Id.* at 6-7 (18:7-21:8)). In this capacity, Walker works for club management, attempting to generate interest in shows at their clubs. (*Id.*). Walker described his job as "to have the fliers and have the microphone and be with the deejay to promote in the streets and let people know that [a club has] an event coming up . . . . You put fliers all around the school. You go to [other colleges]. You invite Greeks and fraternities out. You put fliers in stores and, you know, wherever you can." (*Id.* at 6 (19:2-13)). Walker has promoted shows at Miles College since at least 2005. (*Id.* at 8 (25:5-17)).

**C. Incident and Aftermath**

On August 23, 2014, Walker was on the Miles College campus at approximately 9:15 a.m. for a high school visitation. (Doc. 1-1 at ¶ 4; doc. 16-4 at 19 (70:5-72:7), 20 (73:12-16)). Walker had an agreement with Miles College to use the college gym for a motivational seminar for the high school students, in which he played the role of "Mr. Prevention," a superhero attempting to

prevent bullying, STDs, crime, gangs, and violence. (Doc. 16-4 at 19 (70:5-72:7)). Walker took a group of students on a tour of the campus, going from building to building and allowing members of Greek organizations and school leaders to speak to the students. (*Id.* at 20 (73:21-75:2)). The tour was over at about 1:30 p.m., when parents began to arrive to pick up their children. (*Id.* at 20 (76:14-17)). Parents continued to arrive until about 3:00 p.m., when the last student left. (*Id.* at 20-21 (76:14-77:1), 27 (102:13-23)).

After the high school visitation, the Miles College students started a block party that included a water balloon fight. (*Id.* at 20 (76:18-20), 27 (102:23-103:6)). Walker stayed at the block party until about 5:00 or 6:00 p.m., when he got hungry and left with a friend for Applebee's. (*Id.* at 21 (77:10-78:11)). Walker stayed at Applebee's for no more than an hour. (*Id.* at 21 (78:20-21)). At Applebee's, Walker drank one Long Island Iced Tea.[4] (*Id.* at 38 (148:7-9)).

Nolan's shift that day began at 3:00 p.m., about the time that the block party started. (Doc. 16-5 at ¶ 8). During his patrol, the Miles College band director, Mr. Snipe, told Nolan he was "going to get Chello [i.e., Walker]" if Walker hit him with a water balloon. (*Id.*). Later, Nolan received a call from Ms. Brown, the Student Activities Director, asking him to get Walker because he was "cutting up" and needed to leave. (*Id.* at ¶ 9). Nolan made his way to the area where the students had congregated. (*Id.*). On the way there, Nolan was approached by a student named Isaiah, who asked him to get Walker because he was in the way and was "messing around." (*Id.*).

---

[4] Applebee's Long Island Iced Tea is a cocktail containing "five spirits – vodka, rum, gin, tequila and triple sec – mixed with sweet & sour mix, topped with a splash of cola[.]" *Applebee's® $1 Long Island Iced Tea - the DOLLAR L.I.T. - Returns to Kick Off Summer.* https://news.applebees.com/2018-06-01-Applebees-R-1-Long-Island-Iced-Tea-the-DOLLAR-L-I-T-Returns-to-Kick-Off-Summer (June 1, 2018).

Back on campus, Walker was finding it difficult to engage with the block party; he was promoting a party at a club called the Bull's Eye the same evening, and people were calling him about that party. (Doc. 16-4 at 21 (80:6-20)). Walker's purpose at that point was to promote the Bull's Eye party, and the same deejay at the block party was going to be at the club later that evening. (*Id.* at 27 (103:21-104:7)). During a call with one of those people, Walker walked twenty to forty feet away from the deejay. (*Id.* at 21-22 (80:18-81:18)). At some point during this phone call, Walker could "feel the presence of somebody walking up on [him]" and turned around." (*Id.*).

It was Nolan. (*Id.* at 22 (81:7)). According to his affidavit, Nolan noticed a "very strong smell of alcohol" around Walker as he approached. (Doc. 16-5 at ¶ 11). Nolan asked Walker to leave campus due to the complaints, but Walker refused to leave and was "loud and belligerent . . . cursing and combative." (*Id.*). Walker denies he was belligerent and that Nolan asked him to leave campus. (Doc. 16-4 at 26-27 (99:5-101:4), 36 (138:9-139:11)). Instead, Walker testified Nolan was "in [his] face," telling him that "someone on the yard got a problem with [Walker]." (*Id.* at 22 (81:7-82:8)). Walker responded, stating: "hold on, hold on, man, what's going on." (*Id.* at 26 (100:14-19)). Nolan repeated his statement, and Walker said: "let's go get them, who is it, let's go get them." (*Id.* at 26-27 (100:19-101:1)).

After this, Walker testified, Nolan grabbed Walker by his pants leg with one hand, grabbed him by the shirt at the shoulder with the other hand, and lifted him approximately six feet into the air. (*Id.* at 22-23 (84:6-86:11), 27 (101:2-4)). In Walker's words, this maneuver flipped him upside down, and Nolan then slammed Walker to the concrete. (*Id.* at 23 (86:9-22)). Walker's account is contradicted by cellphone footage taken by an observer, which shows Walker being forced to the ground from a standing position, rather than picked up and held in the air before being slammed to the ground. (*See* Defendants' Exh. 1E at 00:02-00:03). In Nolan's affidavit, he

described his contact with Walker as follows: "When he got up close to my face I grabbed his arm and he jerked away, almost hitting me in the face. I stuck my leg out and Walker fell to the ground and I straddled him to keep him under control." (Doc. 16-5 at ¶ 14). In a written statement after the incident, Miles College security guard Corey Burden stated he had observed Nolan tell Walker to leave campus, after which Nolan touched Walker's arm. (Doc. 16-3 at 17). According to Burden, Walker then "threw his elbow back towards [Nolan's] chest area," after which Nolan "reacted in defense mode by slamming Mr. Walker to the cement." (*Id.*).

In any event, Walker testified that after he was taken to the ground, Nolan then "jump[ed] on" Walker's back, putting his knee in Walker's back and holding Walker's arms behind him until Nolan eventually handcuffed him. (Doc. 16-4 at 24 (89:8-92:9), 25 (93:20-95:20)). Cellphone video footage taken by a bystander shows Walker cursing loudly and extensively at Nolan while he was being restrained. (*See* Defendants' Exh. 1F). Nolan searched Walker's pockets for weapons and illegal substances while he was on the ground. (Doc. 16-5 at ¶ 17). According to his statement, Burden then called Chief Kennon. (Doc. 16-3 at 17). Burden's statement also reflects he could smell alcohol on Walker's breath and that Walker admitted to Burden he had been drinking. (*Id.*).

Walker had been on the ground for eight to ten minutes, restrained by Nolan, when Chief Kennon arrived. (Doc. 16-4 at 28 (107:13-16)). Chief Kennon stated in his affidavit he observed Walker was "very intoxicated and smelled strongly of alcohol." (Doc. 16-3 at ¶ 15). After Chief Kennon spoke with Nolan and Walker, he uncuffed Walker and told him he was free to go. (Doc. 16-4 at 28-29 (108:6-109:19), 30 (115:9-11)). However, after Walker walked thirty to fifty feet, he collapsed, and his next memory was waking up in an ambulance. (*Id.* at 30 (115:16-116:3)). Walker then got out of the ambulance to attempt to get an explanation for what was happening.

(*Id.* at 31 (118:4-21)).  In his affidavit, Chief Kennon stated Walker jumped out of the ambulance and said he was "alright," after which he was placed back in the ambulance; Walker jumped out again and refused to go to the hospital.   (Doc. 16-3 at ¶ 16).  Because Chief Kennon considered Walker a friend and because Walker "is a part of the Miles College community, is well liked, and is known to act up and clown around," Chief Kennon declined to pursue criminal charges against him.  (*Id.* at ¶ 17).

Instead, Chief Kennon offered to take Walker home; after Miles College's head of security yelled to Chief Kennon to get Walker off campus, Chief Kennon drove Walker home.  (Doc. 16-4 at 31-32 (118:22-121:8)).  When Walker returned home, his girlfriend was upset at his injuries.  (*Id.* at 32: 121:10-122:20)).  She drove Walker back to campus, where Chief Kennon gave Walker his cellphone.  (*Id.* at 32-33 (123:6-125:8)).

Walker then went to the emergency department at Princeton Baptist Medical Center in Birmingham, where he was given a CAT scan, bandaged up, and discharged.  (*Id.* at 33 (125:9-127:10)).  Dr. Bruce Burns, who treated Walker, testified Walker had superficial abrasions on his face and left shoulder, but a normal range of movement in his extremities and no broken or dislocated bones.  (Doc. 16-6 at 6-7 (17:4-21:4)).  Dr. Burns further testified Walker's coordination was abnormal, his speech was slurred, and his examination was consistent with being under the influence of alcohol; in other words, Walker was intoxicated.  (*Id.* at 7 (21:16-22:11)).

Chief Kennon prepared an Incident/Offense report after the incident, in which he described Walker (using his nicknames "Donatello" and "Tello") as "so intoxicated at the time of this incident he was advised that if he wanted to file a police report he could" but that he was too intoxicated to file one at that time.  (Doc. 16-3 at ¶ 20, 12-13).  Chief Kennon also conducted an

investigation into the incident, ultimately clearing Nolan of inappropriate conduct or force. (*Id.* at ¶¶ 22-23).

## III. Analysis

It is somewhat unclear what claims Walker is actually asserting. The "preliminary statement" in the complaint states the following:

> 8. This is an action to recover damages under 42 U.S.C. Section 1983 for deprivation of civil rights under color of state law, false arrest, false imprisonment, and police misconduct by members of the Miles College Police Department.
>
> 9. Plaintiff also sues under state common law for personal injuries, deprivation of civil rights, false, [sic] arrest, false imprisonment, police misconduct, and tort of outrage.

(Doc. 1-1 at ¶¶ 8-9). Contrary to these assertions, the complaint contains no count specifically identifying a constitutional violation under § 1983 consistent with ¶ 8, nor does it exactly match up with the purported counts in ¶ 9 (as it does not contain a tort of outrage count). In his jurisdictional allegations, Walker repeats the statement the complaint asserts constitutional violations, "particularly under provisions of the First, Fourth, Fifth, Sixth, and Fourteenth Amendments," and claims under 42 U.S.C §§ 1983 and 1988. (Doc. 1-1 at ¶ 10). But, again, the specific constitutional violation each count alleges is never identified.

Instead, the complaint contains what appears to be a state law false arrest count, (*id.* at ¶¶ 25-27); a state law false imprisonment count, (*id.* at ¶¶ 28-30); a state law assault and battery count, (*id.* at ¶¶ 31-34); a state law malicious prosecution count, (*id.* at ¶¶ 35-40); a state law negligent training count, (*id.* at ¶ 41-44); and a count for "mental anguish," (*id.* at ¶¶ 45-47), which is a list of categories of damages Walker claims he suffered rather than a separate, substantive claim. However, both Defendants and Walker assume the complaint supports one or more § 1983 claims. At a minimum, the false imprisonment count partially tracks the language of § 1983 in

that it alleges Nolan acted "under color of state law," (*id.* at ¶ 29), and Walker sets out the § 1983

false imprisonment standard in his response to the motion for summary judgment, (*see* doc. 23 at

6). For the purposes of this memorandum opinion, the undersigned assumes the complaint asserts

§ 1983 claims, to the extent they can be asserted,[5] and claims under state law.

**A. Section 1983 claims**

Regardless of which of the counts Walker alleges § 1983 claims for, "[a] successful section

1983 action requires that the plaintiff show [he] was deprived of a federal right by a person acting

under color of state law." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1314 (11th Cir. 2017) (citation

omitted). Therefore, Walker is obligated not only to show a constitutional violation, but that Nolan

acted "under color of state law."

It is undisputed that Miles College is a private college and Nolan is a private security guard,

meaning that they are not state actors in the traditional sense. For a private actor to act under color

of state law such that he or it can be considered a state actor, a court must find that "one of the

following three conditions is met: (1) the State has coerced or at least significantly encouraged the

action alleged to violate the Constitution ('State compulsion test'); (2) the private parties

---

[5] Generously reading Walker's complaint, he intends to allege Fourth Amendment violations for his false arrest, malicious prosecution, and assault and battery counts, and a Fourteenth Amendment violation for his false imprisonment claim. *See Graham v. Connor*, 490 U.S. 386, 388 (1989) (holding excessive force is a "seizure" under the Fourth Amendment); *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004) (stating the elements of a federal malicious prosecution claim under § 1983, which includes "a violation of [the plaintiff's] Fourth Amendment rights"); *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010) (analyzing § 1983 false arrest claim under Fourth Amendment standard); *Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996) (the elements of a § 1983 false imprisonment claim include the elements of a common-law false imprisonment claim plus a due process violation under the Fourteenth Amendment).

performed a public function that was traditionally the exclusive prerogative of the State ('public function test'); or (3) 'the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise[]' ('nexus/joint action test.')" *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001) (citation omitted).

Defendants rebut each of these potential theories. First, they point to the State of Alabama's lack of direct involvement in the incident. (Doc. 16-1 at 6-7). Next, they state neither Nolan nor Miles College were performing an exclusively public function because the common law allows a private actor to eject an intoxicated, disruptive person. (*Id.* at 7) (citing *State v. Slobin*, 682 A.2d 1205 (N.J. Sup. Ct. App. Div. 1996)). Finally, Defendants note that there is no evidence of interdependence between the State of Alabama and Miles College or Nolan such that they meet the nexus/joint action test. (*Id.* at 7-8).

Walker offers no response to any of Defendants' arguments. Consequently, to the extent he states § 1983 claims, they are abandoned. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) (dismissing undefended claims on summary judgment); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."). Therefore, Defendants are entitled to summary judgment on each of Walker's § 1983 claims.[6]

---

[6] Defendants also deny a constitutional violation occurred at all, (doc. 16-1 at 13-17), arguing Nolan is entitled to qualified immunity, (*id.* at 17-22), and contending § 1983 liability cannot be imposed on Miles College because there is no underlying constitutional violation, (*id.*

**B. Counts I, II & III – Assault and Battery, False Arrest, and False Imprisonment**

Defendants argue their motion is due to be granted as to Walker's state law claims because Nolan's conduct was privileged under state law as a citizen's arrest. (Doc. 16-1 at 9-13). Only Walker's assault and battery, false arrest, and false imprisonment claims depend on the legality of the arrest itself or the physical contact that accompanied it. *Allen v. Walker*, 569 So. 2d 350, 351 (Ala. 1990) (quotation marks and citation omitted) ("An assault consists of '. . . an intentional, <u>unlawful</u>, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.") (emphasis added);[7] ALA. CODE § 6-5-170 ("False imprisonment consists in the <u>unlawful detention</u> of the person of another for any length of time whereby he is deprived of his personal liberty.") (emphasis added); *Kmart Corp. v. Perdue*, 708 So. 2d 106, 110 (Ala. 1997), *as modified on denial of reh'g* (Dec. 19, 1997) (false arrest and false imprisonment share the same elements).

Under Alabama law, a private person may conduct a citizen's arrest for a public offense if that offense is committed in his presence. ALA. CODE § 15-10-7(a)(1).[8] Unless the person to be arrested is currently committing the offense, the arresting person must inform him or her of the cause of the arrest. ALA. CODE § 15-10-7(c). A person making a citizen's arrest has a duty to "take [the arrestee] without unnecessary delay before a judge or magistrate, or to deliver him to

_____

at 22-25). Walker also does not respond to any of these arguments; therefore, his § 1983 claims are alternatively due to be dismissed on each of these bases.

[7] "A successful assault becomes a battery." *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986) (quotation marks and citation omitted).

[8] Alabama law also provides for more expansive citizen's arrest powers when the arrested person has committed a felony, *see* ALA. CODE § 15-10-7(a)(2) & (3) (1975), but Walker is not alleged to have committed a felony in this case.

some one of the officers specified in Section 15-10-1."[9] ALA. CODE § 15-10-7(e). "The rights and powers of a private citizen in making an arrest for an offense, and on the times and occasions provided for by the statute, are the same as those of an officer." *Suell v. Derricott*, 49 So. 895, 901 (1909) (referring to a previous, but substantively similar, version of the statute). Consequently, a person making a citizen's arrest may use reasonable force to effect it, and a person subject to a lawful citizen's arrest has a duty to peacefully submit to it. *Smitherman v. McCafferty*, 622 So. 2d 322, 325 (Ala. 1993); *Graham v. Connor*, 490 U.S. 386, 396 (U.S. 1989) (observing that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). To demonstrate a false arrest, a plaintiff must offer sufficient facts sufficient to support that there was no probable cause to make the arrest. *Walker v. City of Huntsville*, 62 So. 3d 474, 493 (Ala. 2010).

Public intoxication constitutes a "public offense" under Alabama law, and may be the basis for a citizen's arrest. *Hill v. State,* 665 So. 2d 1024, 1028 (Ala. Crim. App. 1995). A person commits the offense "if he appears in a public place under the influence of alcohol, narcotics or other drug to the degree that he endangers himself or another person or property, or by boisterous and offensive conduct annoys another person in his vicinity." ALA. CODE § 13A-11-10(a). For the purposes of the statute, a school is a "public place." Ala. Code. § 13-11-1(2). Mere drunkenness or staggering is insufficient to meet the elements of the offense. *Congo v. State*, 409 So. 2d 475, 477 (Ala. Crim. App. 1981).

---

[9] Section 15-10-1 refers to "any sheriff or other officer acting as sheriff or his deputy, or by any constable, acting within their respective counties, or by any marshal, deputy marshal or policeman of any incorporated city or town within the limits of the county." ALA. CODE § 15-10-1.

Defendants state the undisputed evidence supports that Nolan received complaints about Walker's "cutting up" and "messing around" and repeatedly asked Walker to leave campus because of his intoxicated state. (Doc. 16-1 at 11). They also contend it is undisputed Walker was loud, yelling and cursing, and that when Nolan attempted to subdue him, Walker was belligerent. (*Id.*). Nolan's affidavit supports this contention; he characterizes Walker as "loud and belligerent" and "cursing and combative" during the incident, and states that Walker "got up very close to [Nolan's] face as [he] was trying to manage the situation." (Doc. 16-5 at ¶ 14). Nolan's written statement after the incident, which he reaffirms in his affidavit, (*id.* at ¶ 12), tells a similar tale. (*See* doc. 16-3 at 14-16). As stated above and discussed further below, Walker's testimony indicates some of this evidence is in dispute.

However, the undisputed evidence does show Walker was intoxicated. Both Nolan and Burton stated they could smell alcohol on Walker. (Doc. 16-3 at 14, 17; doc. 16-5 at ¶ 11). Chief Kennon also testified Walker "was very intoxicated and smelled strongly of alcohol" when he approached Walker after responding to the scene of Walker's arrest. (Doc. 16-3 at ¶ 15). Dr. Burns testified when he examined Walker shortly after the incident, Walker's coordination was abnormal and he had slurred speech, leading him to the conclusion that Walker was intoxicated. (Doc. 16-6 at 7 (21:16-22:11)). Additionally, in the incident/offense report filed by Walker against Nolan, Chief Kennon noted that "[Walker] was so intoxicated at the time of this incident he was advised that if he wanted to file a police report he could but cant [sic] do it now you are to [sic] intoxicated." (Doc. 16-3 at 13).

Finally, Defendants argue Nolan complied with the statutory requirements of a valid citizen's arrest. They contend Nolan was not required to inform Walker of the reason for the arrest because the public intoxication offense was ongoing when Nolan seized Walker. (Doc. 16-1 at

12).  Further, complying with his duty under the statute, Nolan turned Walker over to Chief Kennon, who is a reserve officer for the City of Fairfield (and is, in any event, "charged with all the duties and invested with all the powers of police officers" by virtue of Ala. Code § 16-22-1(a)), when the chief arrived on the scene.  (*Id.*).

The only opposition Walker offers to this argument is the assertion that Nolan "arrested Walker in response to someone saying they had a problem with Walker without regard to whether a crime was being committed.  It was therefore a false arrest . . . and said arrest did not amount to a valid citizen's arrest." (Doc. 23 at 10).  Walker backs up this conclusory statement with neither argument nor citation to evidence, and it is insufficient to oppose Defendants' motion for summary judgment.

Otherwise, Walker's response brief addresses only Defendants' state agent immunity argument, which is irrelevant because Nolan is not a state actor.[10]  In this context, however, Walker arguably opposes Defendants' citizen's arrest defense through his discussion of Ala. Code § 15-10-3.  (Doc. 23 at 7-9).  Although this statute only provides authority for police officers' warrantless arrests of suspects (and is therefore irrelevant to Nolan, a security guard), it is comparable to the citizen's arrest statute in that both allow for arrest when a public offense has been committed in the presence of the arresting person.  *Compare* ALA CODE § 15-10-3(a)(1) ("An

---

[10] Defendants argue if Nolan is a state actor, he is entitled to state agent immunity, (doc. 16-1 at 25-28), and that Miles College enjoys the same immunity Nolan does, (*id.* at 28-29). Walker attempts to counter this by showing that Nolan was (1) engaging in a ministerial rather than discretionary function or (2) acting "willfully, maliciously, fraudulently, in bad faith, beyond Defendant's authority, or under mistaken interpretation of the law." (*Id.*).  Either of these would defeat state agent immunity, if adequately supported, but Walker has not made any argument that Nolan is a state actor such that immunity is relevant in this case.  As stated above in discussing Walker's § 1983 claims, Walker does not point to anything in the record that would support that Nolan is a state actor.

officer may arrest a person . . . [i]f a public offense has been committed . . . in the presence of the officer") *with* ALA CODE § 15-10-7(a)(1) ("A private person may arrest another for any public offense . . . [c]ommitted in his presence."). Walker also cites Ala. R. Crim. P. 4.1 for the proposition "an arrest on a misdemeanor charge is unlawful where the misdemeanor was not committed in the arresting officer's presence or view." (Doc. 23 at 7). This is presumably a reference to Ala R. Crim. P. 4.1.(a)(1)(ii), which applies specifically to arrests by law enforcement officers — and, again, Nolan is not one — but it is consistent with Ala. R. Crim. P. 4.1(b)(1)(ii), which applies to warrantless arrests by private persons. That provision states "[a] private person may arrest another without a warrant if . . . [t]he person to be arrested committed an offense, other than a felony, in the presence of the arresting person." ALA R. CRIM. P. 4.1(b)(1)(ii).

Assuming they apply to Defendants' citizen's arrest defense, Walker's contentions are conclusory and undeveloped. Walker asserts "Officer Nolan did not . . . personally observe Walker committing a misdemeanor offense in his presence or view." (Doc. 23 at 7-8). Walker acknowledges Nolan's affidavit supports that "Walker smelled strongly of alcohol, and he appeared and acted drunk," (doc. 23 at 8), but does not attempt to counter or dispute this in any way. Instead, Walker presumably relies on the fact "[n]o mention or report is made of Walker being a danger to himself or others," (doc. 23 at 8), to contest Nolan had probable cause sufficient to support an arrest for public intoxication. Defendants have cited evidence indicating Walker was belligerent, hostile, and threatening towards Nolan prior to his arrest. Although Walker's brief does not specifically point to facts that would dispute this, it is clear from the record Walker denies his purported belligerence, hostility, and threatening behavior. (*See* doc. 16-4 at 26-27 (99:5-101:4), 36 (138:9-139:11)).

If Walker's dangerousness were the only basis on which Nolan could have had probable cause to arrest him, this factual dispute would preclude summary judgment. But Walker misreads the statute; a person may be guilty of public intoxication not only when he is a danger to himself or others, but also when he "by boisterous and offensive conduct annoys another person in his vicinity." ALA. CODE § 13A-11-10(a). It is undisputed Nolan did not personally witness any of the "cutting up" and "messing around" reported to him by Isaiah and Ms. Brown.[11] However, Alabama courts have held in the context of a warrantless public intoxication arrest by a police officer that probable cause to believe that a person has endangered himself or another can be established by events outside the officer's presence. *See $4,320 U.S. Currency In Possession of Bulger v. State*, 567 So. 2d 352, 353 (Ala. Civ. App. 1990) (witness report that staggering and swaying appellant had fired a gun sufficient to supply probable cause to arrest for public drunkenness); *Watkins v. State*, 601 So. 2d 187, 190 (Ala. Crim. App. 1992) (officer had probable cause to arrest defendant for public intoxication based on meeting description of robbery suspect he heard over police radio, even though officer had only observed defendant's drunkenness). It follows that a verbal report of annoying, boisterous conduct supplies probable cause to arrest an intoxicated individual for public intoxication, even when the officer or private person does not actually see the reported conduct. *See Jakes v. State*, 398 So. 2d 342, 346 (Ala. Crim. App.), *writ*

---

[11] Mr. Snipe's report of Walker's conduct occurred prior to Walker's trip to Applebee's. There is no evidence in the record that Walker had consumed alcohol or was intoxicated at that time, so Mr. Snipe's complaint could not have formed a basis for an arrest for public intoxication, even if Mr. Snipe's statement could be interpreted to reflect his annoyance at Walker's conduct. However, the undisputed facts are that Ms. Brown's call to Nolan and Isaiah's report occurred immediately before Nolan walked over to the block party and as he was on his way there. It would be unreasonable to infer that Walker's level of intoxication meaningfully changed during the period of time between Ms. Brown's phone call and the incident.

*denied,* 398 So. 2d 348 (Ala. 1981) ("[I]t would not be essential that an officer actually see the commission of an offense [to establish it was committed 'in his presence'] if another of his physical senses, perhaps that of smell or hearing, could afford him a fair inference that the offense was indeed being perpetrated at that point in time."). Walker does not dispute that Ms. Brown or Isaiah were annoyed by his conduct, nor that they reported their annoyance to Nolan in terms suggesting boisterousness. Therefore, regardless of whether the evidence supports that Walker endangered himself or others, it supports that Nolan had probable cause to arrest Walker for public intoxication due to his boisterous, annoying conduct.[12]

Because there is no genuine dispute of material fact that Nolan's citizen's arrest was lawful, Defendants are entitled to summary judgment on Walker's assault and battery, false imprisonment, and false arrest claims.[13]

---

[12] Under Alabama law, probable cause is typically a jury question in false arrest cases. *Dolgencorp, LLC v. Spence*, 224 So. 3d 173, 183 (Ala. 2016). However, "[i]f the facts on the issue of probable cause are not in dispute, whether such facts amount to probable cause is a question of law for the courts." *Id.* (internal quotation marks and citation omitted, emphasis in original). As stated above, Walker has not shown that the facts supplying probable cause are in dispute.

[13] Although Walker does not expressly argue this, to the extent he contends his allegation he was "slammed" to the ground creates a genuine issue of material fact, his account of what happened is flatly contradicted by the video evidence. Since the Supreme Court decided *Scott v. Harris*, 550 U.S. 372 (2007), the Eleventh Circuit has consistently held that where there is uncontroverted video evidence that blatantly contradicts the plaintiff's account, the court is not required to adopt the plaintiff's version of the events for purposes of summary judgment. *See Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010); *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013); *Mathis v. Adams*, 577 Fed. Appx. 966, 968 (11th Cir. 2014). Walker's account of being lifted into the air and slammed onto the ground is starkly at odds with the takedown depicted in the video, and no reasonable jury could believe his account in light of the video. *See Scott,* 550 U.S. at 380. Similarly, read in tandem with the video, Burden's statement that Walker was "slammed to the ground" does not support Walker's version of events such that it creates a genuine issue of material fact, assuming Walker intends to argue that, (*see* doc. 23 at 9).

### C. Count IV – Malicious Prosecution

In a footnote, Defendants note Walker's malicious prosecution count is not viable because Walker admits he was never prosecuted. (Doc. 16-1 at 13 n.3). "An action for malicious prosecution requires the plaintiff to prove that the defendant instigated, without probable cause and with malice, a prior judicial proceeding against the plaintiff, that the prior proceeding ended in favor of the plaintiff, and that the plaintiff suffered damages." *Lumpkin v. Cofield*, 536 So. 2d 62, 64 (Ala. 1988) (emphasis added). The allegations in Walker's complaint do not support that any judicial proceeding was ever instigated against him, (*see* doc. 1-1 at ¶ 21), nor does any record evidence. Additionally, Walker offers no defense against this argument. Therefore, summary judgment is due to be granted to Defendants on Walker's malicious prosecution claim.

### D. Count V – Negligent Training

Walker's negligent training count asserts Miles College was negligent because it did not train Nolan pursuant to Ala. Code § 16-22-1, which requires officers to be APOSTC certified. (Doc. 1-1 at ¶ 42). As noted above, that section applies only to police officers. *See supra* at section II.A. While it is undisputed Nolan is not APOSTC certified, it is equally undisputed Nolan is a security guard, not a police officer subject to the requirements of § 16-22-1. Additionally, Defendants state there is no evidence Miles College otherwise negligently trained Nolan. (Doc. 16-1 at 29). Walker does not acknowledge this at all, much less point to evidence that would support negligent training. Therefore, Defendants' motion is also due to be granted as to Walker's claims of negligent training.

### IV. Conclusion

For the reasons stated above, Defendants' motion for summary judgment, (doc. 16), is **GRANTED**. A separate order will be entered.

DONE this 24th day of September, 2018.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE